850 So.2d 215 (2003)
Michael KITCHENS, Appellant,
v.
ESTATE OF Sharon Snoddy KITCHENS, Deceased, Appellee.
No. 2002-CA-01090-COA.
Court of Appeals of Mississippi.
July 22, 2003.
*216 Edwin L. Bean, McComb, Attorney for Appellant.
Irving Conrad Mord, Attorney for Appellee.
Before McMILLIN, C.J., THOMAS and CHANDLER, JJ.
THOMAS, J., for the Court:
¶ 1. Michael Kitchens and Sharon Snoddy Kitchens entered into an antenuptial agreement. Sharon died unexpectedly two months later. Michael filed an action to establish heirship and for accounting of Sharon's estate. The trial court found the antenuptial agreement to be valid and binding. Aggrieved, Michael asserts the following issues on appeal:
I. THE ANTENUPTIAL AGREEMENT EXECUTED BY THE PARTIES IS INVALID DUE TO SHARON SNODDY KITCHENS' FAILURE TO MAKE A FULL DISCLOSURE OF HER ASSETS, AND THEREFORE IS UNCONSCIONABLE AND FRAUD.
II. THE ANTENUPTIAL AGREEMENT EXECUTED BY THE PARTIES IS INVALID DUE TO THE CIRCUMSTANCES SURROUNDING ITS EXECUTION.
Finding no error, we affirm.

FACTS
¶ 2. Michael Kitchens, Jr. and Sharon Snoddy lived together in a home owned by Sharon in Magnolia, Mississippi, for approximately a year and a half before they discussed marriage. Michael had two years of college education and served as a water plant operator in McComb, Mississippi. According to Michael, he thought that Sharon managed two day care facilities, although she actually owned both of them. Sharon had made several phone conversations with attorney Dee Shandy in Magnolia regarding an antenuptial agreement and requested that Shandy prepare an agreement which would keep Michael from gaining any interest in her home or the two day care facilities. According to Shandy's testimony, on November 9, 2000, approximately two and a half months after Sharon and Michael had decided to get married, Sharon arrived at Shandy's office, telephoned Michael, signed the agreement prepared by Shandy, and took the original agreement to Michael so that he could go over it. On November 10, Michael took the original agreement back to Shandy's office and executed it before a notary public and obtained a copy of the signed agreement. Michael and Sharon were married on November 11, 2000, and departed on a cruise.
¶ 3. Sharon died unexpectedly on February 1, 2001. Michael made no effort to discover Sharon's assets after her death until he was asked to leave the marital home owned by Sharon. Michael filed an action to establish heirship and for accounting on May 8, 2001, alleging that he was an heir at law and requesting that the court declare the antenuptial agreement null and void. After trial on March 25, 2002, the trial court entered a final judgment finding the antenuptial agreement executed by Michael and Sharon to be valid and binding. Michael filed a motion for reconsideration which was denied by the court after oral arguments on the issue. *217 Michael then perfected an appeal to this Court.

ANALYSIS
I. WAS THE ANTENUPTIAL AGREEMENT EXECUTED BY THE PARTIES INVALID DUE TO SHARON SNODDY KITCHENS' FAILURE TO MAKE A FULL DISCLOSURE OF HER ASSETS, AND IS IT THEREFORE UNCONSCIONABLE AND FRAUDULENT?
¶ 4. Michael Kitchens alleges that the antenuptial agreement executed by he and Sharon was invalid due to Sharon's failure to make a full disclosure of her assets. Kitchens cites Smith v. Smith, 656 So.2d 1143, 1147 (Miss.1995), which imposed a "requirement of fairness in the execution of such contracts" and added, "the restriction on enforceability encompassed a duty of disclosure." A "full disclosure" has not been defined further in the context of an antenuptial agreement in Mississippi. Michael therefore directs this Court to other jurisdictions.
¶ 5. Michael cites Simeone v. Simeone, 525 Pa. 392, 581 A.2d 162 (1990), although Michael states that the Pennsylvania Supreme Court set aside the antenuptial agreement. In actuality, it upheld the agreement and stated:
If an agreement provides that full disclosure has been made, a presumption of full disclosure arises. If a spouse attempts to rebut this presumption through an assertion of fraud or misrepresentation then this presumption can be rebutted if it is proven by clear and convincing evidence.
Id. at 403, 581 A.2d. at 167. In Michael's case, the antenuptial agreement does state clearly that a full disclosure has been made by the parties.
¶ 6. Michael next cites Mathis v. Crane, 360 Mo. 631, 230 S.W.2d 707 (Mo.1950), and In Re: Maag's Estate, 119 Neb. 237, 228 N.W. 537 (Neb.1930). In Mathis, the husband misled his wife in regard to the size of his estate and told her that he would ensure that she would not have to work for the remainder of her life. Mathis, 360 Mo. at 640, 230 S.W.2d at 711. This promise was denied by the evidence. Id. Mathis also failed to make a full disclosure to the court when he was brought before it in an action for temporary maintenance.
¶ 7. In In Re: Maag's Estate, the Nebraska court held that an antenuptial agreement was invalid due to the disparity in value of what the wife would have received if not for the agreement. There were other factors involved, however, including that she was misled as to the contents, never read the agreement nor had it read to her before she signed it, was never given a copy of the agreement, and never had the opportunity to obtain independent counsel. In Re: Maag's Estate, 228 N.W. at 540.
¶ 8. These cases are easily distinguishable from the case at bar. Michael has failed to show by clear and convincing evidence that the agreement was fraudulent or that Sharon misrepresented herself in it. The agreement clearly stated that the home and two day care businesses owned by Sharon were affected by the antenuptial agreement. The record does not show that Michael produced any evidence to show that Sharon owned any other assets not listed in the agreement. Michael testified that he read the agreement and that there was nothing contained in the agreement which was not true. He also testified that no one rushed him to sign the agreement and that he signed it of his own free will.
*218 ¶ 9. An antenuptial contract is just as enforceable as any other contract. Smith, 656 So.2d at 1147. "It is not now and never has been the function of this Court to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 328 (Miss.1988). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996). It was not an abuse of discretion for the chancellor to find the antenuptial agreement valid and the decision was supported by substantial evidence. This issue is without merit.
II. WAS THE ANTENUPTIAL AGREEMENT EXECUTED BY THE PARTIES INVALID DUE TO THE CIRCUMSTANCES SURROUNDING ITS EXECUTION?
¶ 10. Michael asserts that the antenuptial agreement was invalid due to the circumstances surrounding its execution. Again lacking any Mississippi case law on point, Michael cites Lutgert v. Lutgert, 338 So.2d 1111 (Fla. 2d DCA 1976), in which the Florida Supreme Court held that a husband presenting his wife with an antenuptial agreement approximately twelve hours before their wedding and honeymoon cruise did not allow her the opportunity to obtain independent advice and therefore voided the agreement. Similarly, in In Re: Marriage of Matson, 41 Wash.App. 660, 705 P.2d 817 (1985), the Washington Supreme Court found that the wife's execution of a prenuptial agreement on the evening before the wedding negated any inclination that she had an opportunity to obtain independent legal advice and the agreement was therefore void. Michael therefore asserts that according to other jurisdictions, the availability of independent counsel to the party attacking the validity of the agreement must be examined.
¶ 11. The appellee distinguishes Lutgert by noting that Mr. Lutgert's estate was worth approximately $25,000,000 as opposed to the less than $4,000,000 that he had disclosed. Lutgert, 338 So.2d at 1114. Also, the Lutgerts had discussed an agreement for some time, with the wife consistently objecting to such an agreement until the husband presented it to her within twelve hours of their wedding and demanded that she sign it or he would call off the wedding. Id. at 1114. In the case at bar, Michael testified that he signed the agreement of his own free will. The agreement also states that Sharon is represented by counsel and that said counsel advised Michael to seek private legal counsel to advise him regarding the agreement.
¶ 12. In regard to In Re: Marriage of Matson, the appellee points out that Washington is a community property state, and the Washington Supreme Court held the agreement void because, at least in part, "where a contractual agreement attempts to limit or, as in this case, totally eliminate community property rights, equity will zealously and scrupulously examine it for fairness." Matson, 705 P.2d at 821.
¶ 13. Michael has failed to show that the trial court abused its discretion in finding the antenuptial agreement valid. Sharon disclosed the three major assets that she owned at the time of the execution of the agreement. Michael testified that he read the agreement, that he was not rushed to sign it and signed it of his own free will, and that everything contained in the agreement was true. The agreement states in part:

*219 [E]ach party has full knowledge of the value, nature, and extent of the property of the other, including assets, liabilities, and income, has full knowledge of all the rights, but for this agreement would be conferred by law upon each of them in the property and the estate of the other by virtue of the consummation of the proposed marriage; and ... [E]ach party is entering into this prenuptial agreement freely, voluntarily, and with full knowledge of its legal effect.
Michael's own testimony supports the validity of the agreement. This issue is without merit.
¶ 14. THE JUDGMENT OF THE CHANCERY COURT OF PIKE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, IRVING, MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR.